Okay, the next case on the docket is Katherine Smith v. Chase Smith. And this year... May I? Yes, you may. Chief Steiger, may it please the Court, my name is Barbara Scher, and I represent Petitioner Appellant Katie Smith. I'm asking you to do several things today, but mainly to reverse the decision of the trial court to not allow removal, but really in this case, to allow my client, Katie Smith, to remain living in Ohio with her now 3-year-old son, Jackson Smith, as a court in the summer of 2011 allowed her to do on a temporary basis in purpose of taking the job. At the time this case went to trial on June 17th of 2013, my client had been residing in Columbus, Ohio, a suburb of Columbus, Ohio, with their child for almost 2 years, essentially two-thirds of this little boy's life. The court's order in requiring her to come back here, and to come back here within 30 days, was not only against the manifest weight of the evidence, and contrary to the evidence presented, and we've plugged the evidence into the case law and the accurate standards, but there is no way, shape, or form that the court's order could be interpreted as being in the best interest of this little boy, or in the interest of this man. The court did not order her to come back here. When I say here, I mean Illinois. I apologize. Yeah, I mean, she could have gone to the northern border of Wisconsin. And that's a good point, Your Honor. And because she could have done that, if she went to the northern border of Wisconsin from Madison County, let's just say you were driving from the Edwardsville Courthouse to the northern corner of Wisconsin, it would probably take you, what, maybe 5 1⁄2 hours to drive there, 5 1⁄2 to 6 hours? Would that be fair? It's good. Okay, thanks. It works for me. Normal traffic. To drive from the Edwardsville Courthouse, and I'm using that as a sense of authority, assuming people kind of have an idea of where I'm talking about, to where she lives in, it's called Dublin, Ohio, it takes about 6 1⁄2, maybe 7 hours. So it's a distinction to some degree without a difference. Her being in Illinois does not magically affect the best interest of this child. So if she were to go to the northern border of Wisconsin, okay, maybe she'd be an hour closer to where the dad, who I would refer to as Chase since that's his first name, lives. So there's really no reason in making her come back to Illinois. Well, as I read the order, does he even demand that the child comes back? The child or the mother? The child. I don't see in the order where he even says that the child has to come back. He doesn't. Although, if so, back, don't you assume? Well, we're not going to leave a now 3-year-old alone. She's got a great day here, but I don't think it's that good. I think we would be here on other issues. You know, that is an interesting point, and it's sort of the elephant in the room. His order is totally directed at being punitive and somewhat condescending, and in many ways I think sexist, towards my client Katie Smith. If you look at the order as a whole, the synergistic effect of some of the judge's rulings and some of his comments really, I mean, I think support my belief, my position, that it was really arbitrary. It was the result of prejudice. I mean, let's look at some of the comments he made about Katie. And granted, Katie is different than many parents that we see. She is type A, triple A personified. When you think of micromanaging, that is my client. She overparents this child. Nobody is going to doubt that. But overparenting a child doesn't make you a bad parent, and it certainly doesn't mean a child's best interests are served by taking away your ability to make decisions regarding that child, which is what happened with this joint custody order. The joint custody order that he gave them basically said, Katie is doing a great job. You have primary. Jackson is spending the majority of the time with you. But if there is a disagreement over education, medical, extracurricular, or religious, Chase will control, even though Katie has made all the decisions for this child for the last three years. And by the testimony of both parties, the GAL, and even the judge himself in his order basically said to the effect that everybody agrees that this kid is doing great. This kid is thriving. This kid has spent two-thirds of his life in Ohio with Mom doing everything. Part of Chase's complaints are that Mom not only does everything but to some degree to the exclusion of Dad. So when you ask me is it for her to come back, I mean the fact that if she didn't get back into the state of Illinois within 30 days, she loses joint custody. So are we saying that if she's not back in the state of Illinois within 30 days, suddenly these kids' best interests miraculously change, such as Dad who really has not made the decisions for this kid, taken care of his medical, he abdicated his ability to take part in a daycare situation, as far as choosing a daycare, that suddenly we're going to give this Dad sole custody? And this is a Dad who I believe the evidence shows has some really poor decision-making capabilities that I would be more concerned about him being the one to make the decisions than Katie. I mean given a choice, I would rather see a parent who is neurotic about the kid eating organic food and knowing what size shoe they have, knowing what the model number and serial number is on their car seat. There's something about that in the record that you'll see. Then a father who impulsively quits his job, he had a job where he worked out of the home, he had no cost for transportation, he could have had a flexible schedule, chose not to utilize that to spend more time with his son. During the two years from the time this case was filed, I guess in December of 2010, so two and a half years, during that time period, he increased his debt by $22,000, he quit a job where he worked out of the house and only had to go into the office from his home in Collinsville out to West County, St. Louis, which is about an hour and a half round trip one time a week. He had a car that was almost paid off at Kia but traded it in for a new Prius, so suddenly he has this car payment. This is also a father who, when medical tests were recommended for their child, decided not to do them, and the GAL said it was primarily because of the cost. I mean is this who we want parenting our child? Or the mother who insists on buying her kids apples at Whole Foods instead of at Schnucks or Dearburg's? So I think the comments by the court towards Katie, other comments that I think support my position, that their view towards her was essentially, you've been naughty, so we're going to limit and humiliate you as far as how much custody or how much of a role you have in this child's life, other than essentially being a glorified babysitter. There were some very condescending and paternalistic comments about her career path and her job choice. I'm sorry. You put those in the brief. I did. I want to ask you, I want to kind of redirect you on just a couple of questions. Certainly, I apologize. I apologize for this. The court indicated that he was not going to have Chase pay certain monies that Chase admitted responsibility for. What was the context? Are you talking about the visa bill? Yeah, and I did have that. It was not going to be one of my high points, but it is definitely an issue. We're talking about a visa bill. I believe you're talking about the visa bill here. Yes, I am. Which my client had in her own name. She was primarily the financially responsible adult during the marriage. There was some conflict as to how much was owed. In the scheme of things, of this overall case and the issues, it was not a major issue, so we had brief testimony on it. I think she agreed with the judge that maybe it would be $2,400 and that was an okay figure. Chase himself conceded he owed it. They had significant medical bills. This was a child who was in the NIC unit at Northwestern University when he was born. He conceded he owed it. For the judge to turn around and say there was really nothing there to support it, it's error. I think that Chase does owe that money. What was the issue related to these e-mails? The record, I think, has 2,000 e-mails. I thought about bringing them down here today. You don't need to. Thank you, because my back can't really handle it. I'm not talking about 2,000 e-mails. You know how e-mails, if there's a topic, it will go in strings? There's 2,000 e-mails. You know how when you bounce back and forth with your friend or your child and keep seeing the same strings? These are not 2,000 e-mails that are repetition. These are 2,000 e-mail strings. They fill three of the hugest binders that you can order for a girl. Okay. I'm sure you are. You have obviously heard my story. Okay, so the issue as far as admission at trial? Yeah, what was the settlement, your objections, and what were they trying to put in? They were trying to make my client look like a micromanaging nitpicky control freak, which she may be, but that's not a reason. Well, there was discussion about settlement. Okay. It was not settlement of the case overall. It was settlement of ongoing issues in the case at the time. There was a time period where Chase, Mr. Smith, was between attorneys, his prior attorney. I think there was maybe a month in there before he hired Mr. Steiger, so he would communicate with me, and there were some attempts to settle. There were some settlement issues between Katie and himself. I believe the ones that came in, well, they didn't come in, but they did come in because the judge read them, and I think they were clearly in his mind when you look at some of the comments he made in the order. They had to do with, I believe, Christmas vacation or Thanksgiving vacation, visitation, working that out, which did end up going in front of a judge in court eventually, because they couldn't quite work it out or they couldn't work it out fast enough for one of the parties. And then there were some e-mails or letters back and forth. Let me just ask a question about that, too, if I can. So if the parties were e-mailing back and forth about a visitation arrangement for a holiday, let's say, you were objecting saying they were trying to settle visitation for that holiday? It's not a clear yes or no question. May I answer it? Sure. Well, I'm not requiring that you answer yes or no. That was part of it, but the problem also was the context. The way these were brought in, they were taken out of context. Also, if you looked at these actual e-mails, there was no proper foundation established, and I don't think you could have done one because it was a cut-and-slice job by opposing counsel. Probably to make it easier, I'm certainly not saying that Mr. Stiger was trying to pull one over on the court, but when you can't see those within context, it was highly prejudicial to my client. And the judge's reasoning for admitting them, it's like the judge acknowledged, okay, I get these are settlement discussions, but I can look at them. I'm tired. In fact, I can sort of decide for myself if it's relevant or not. Well, even more to the point, one of the issues in the case was custody, and one of the issues in determining custody is each party's willingness to cooperate and so forth and so on. And so wouldn't these e-mail discussions about trying to resolve visitation on a holiday and so forth like that go directly to whether the parties, one, can cooperate for joint custody, two, which side is willing to work with the other one, those kind of things. Wouldn't it all be directly relevant to those issues? Here's my answer. Yes, but you need to look at it in context. And the way this was done, and I was understandably surprised because it did bring in settlement negotiations. To really get to the truth and to get the true answer in this case, if the judge really wanted to do that, he could have taken a brief recess to allow me to go pull my e-mails and to present it in the proper context. At the time this was done, it was mid-afternoon of the trial. What would have been the harm to allow everything to come in there? But the way he heard it, it's kind of like, you know the movie When Harry Met Sally? Everybody knows that movie. There's the comment about you can't take it back. Once it's out there, it's out there. It is in your mind. And the way this was presented, it played into the theme of Chase and Mr. Steiger of my client from micromanaging dictatorship. That's his job. He's supposed to be following that theme. He's supposed to be following that theme. But the problem is this. The way it was done, and some of the judge's comments indicate he knows there were settlement discussions. It's kind of like, yeah, I sort of know it's a violation of the rule. But the judge made some comments, and if you read through the transcript, you'll see this, to the effect of, I've seen Mr. Steiger doing this plenty. I know where he's going. Well, that's not an exception in the Illinois Federal Rules of Evidence that I know what Mr. Steiger's doing. I mean, Rick is a good attorney, but he hasn't made it in as a footnote in the Rules of Evidence yet, you know, to be a reason that you're allowed to do something. It's the Steiger exception. It's the Steiger exception. Well, then we also have the Scherer exception of we take a 20-minute break because that perfectly goes with these 2,000 emails. The problem is, when you look at what those emails said and you see these comments about my client, it's hard enough to think it was there. And there was no reason for the judge to look at it. He acknowledges there's settlement discussions. He also seems to think they can cooperate because he did hold for joint custody. And all of these people, I mean, these people know how to push one another's buttons probably better than any couple I have seen in 24 years of doing that. However... I don't know, did you hear the argument on Wednesday? I did, I did. Runner's up. But the thing is this, they always work it out. The GAL said that. Everybody agreed their communication was improving. They dicker back and forth. Just because parents, you know, dicker back and forth and dicker back and forth and know how to do this to one another, that doesn't mean that you decide that one of them is the naughty parent and punish them. It doesn't mean that you don't award joint custody. Clearly it doesn't. Let's suppose that we grant your relief. What relief are you asking for? I am asking for one... Sole custody, joint custody? She's fine with joint custody. But may she be allowed to live in Ohio? Definitely in Ohio. She's got a great job there. And despite the judge's comments that this is not her career path, I mean, he doesn't understand why she's in such a niche market. Her undergrad degree is in business with a concentration in marketing. She's in advertising. Before you run out of time, though, I want to ask this question. Sorry. I understand your passion. I am. How would visitation work? The court seemed very concerned about visitation. I know they did. First of all, you have to realize this. In many of the removal cases that we have before us, Altar, Carr, Demaret, these are situations where parents, let's just say dads, they usually were dads with a mom, dads had an established visitation and things were being taken away from them. In the case of Katie and Chase and Jackson, Chase is actually getting more time with Jackson now than he did before Katie left. We've proposed several visitation schedules. The GAL even recommended, until Jackson starts school, you do an eight-day period from the Saturday one weekend until Sunday the following each month, which is more time than you get with every other weekend, plus make-up time during the summer. And for a little boy, the whole summer with his dad to do things like ball and all that, he thought this would work. Just because visitation isn't perfect, it's not required to be perfect under Actors. Best interests do not equal perfect. And these courts in Illinois have allowed removal to Texas, to North Carolina, to military, who are going to change every couple of years, and to Switzerland. So suddenly we can't go six and a half hours, seven hours to Ohio, but we can go five and a half hours to whatever the northernmost point is in Illinois, by Wisconsin. It doesn't make sense. So the relief I'm asking for is you allow removal, you keep joint custody in effect, and take away this business of Chase having ultimate veto power on joint decision-making. Thank you for your time. Mr. Stegner. Thank you, Justice Cates, Ms. Scherer. What we're really talking about here, and what Judge Byers was faced with, was a tale of two Cates. Was she the best of moms? Was she the worst of moms? Their case at trial, and their case here, was she was a new mom,  Our case at trial was that she was a parent who was unwilling to co-parent and encourage any relationship with dad, and that's what our evidence was. We read in your opinions all the time of the importance of considering the role of the trial court in having to see the witnesses, hear the witnesses, and be able to see them live and assess their credibility. We have the factor in effort on the removal side of the trial court's ability to observe both parents, assess and evaluate their temperaments, personalities, capabilities. Based upon that, the presumption is that the result reached by the trial court is always strong and compelling. On the custody side, I think we cited Schindle versus Carter, the superior opportunity of the trial court to observe. Let's take a look at the custody first. The trial court found the key factor in this case under 602 is factor number eight, the willingness and ability of the custodial parent to facilitate the relationship of the non-custodial parent and encourage the relationship. The party separated with Jackson was two months old. At the time of trial, the case was pending for two and a half years. We had a substantial record. This was not a six-month record. We had a great record of what had Katie done over those two and a half years to bring Dad into Jackson's life. And the evidence showed that she was not just a concerned parent, but she was taking every possible step to exclude Dad. I thought the GAL made a finding that Mom had actually done things to facilitate the relationship with the child, and in fact the child had a good relationship with his dad. I think the child had a good relationship with his dad despite Mom. I don't think the GAL... Was that the GAL's finding? The GAL's finding was that the child had a good relationship with both parents. I don't recall the GAL having any basis in reality to find that Mother had worked to facilitate the relationship with the child. Mother blocked Dad's access to the pediatrician records. Mother denied Dad visitation for any time on the child's first Christmas. At the time of trial, Dad had never had visitation with the child on Christmas or Thanksgiving, Christmas Day or Thanksgiving, period. She refused to allow him visitation until he provided her the brand of the car seat, the serial number of the car seat, and a purchase receipt for the car seat. She refused to allow him overnight visitation until he provided the make of the crib and the model of the crib. Up to the time that she removed, okay, there were no overnights. He continually requested for overnight visits. The visits she provided, he could come over two times a week in the evening after work and be with Jackson at her parents' house with them sitting in the next room for two hours. If the child fell asleep, he had to go home. Did you argue that having the child in Madison County would facilitate the relationship with maternal grandma? Oh, we didn't, but that was a fact because the parents were there. You did argue that, or the court said that. The court, yeah, I mean, that was evidence before the court. And yet the maternal parents don't like your client. No, I think... And I was wondering where the court came up with that line because the court seemed to say that having the child here with the maternal grandparents would facilitate the relationship with the father, and yet the father and the grandparents don't seem to get along. Well, I think what the court was saying is there's nothing in Ohio. There was absolutely nothing in Columbus, Ohio. Her family remained here. Her mother's family was in St. Louis. Were they going to move? Were they going to move? No. Her family wasn't going to move to Ohio? They were... If you look at the initial pleadings on the emergency removal, they were moving to Columbus, Ohio. They're still living in Maryville. And I think the evidence was that that was not a realistic representation by Katie. I don't think the parents intended to move. I think that was part of the plan to get out of town, if you will. But let's go down the list. If the court affirms you're the order... Sure. ...and Katie does not move back... Right. ...your client gets sole custody, right? Right. How would your client facilitate visitation of the child and Katie? The record in this case is absolutely replete, Judge. Every single time there was compromise, it was case compromised. Answer... If you can answer my question, how would you... I mean, the court's order on visitation is unworkable, according to both of you, because of the Fridays and the weeknights, and they just don't work. Well, I mean, in my humble opinion, if you affirm she's moving back to Massachusetts... Well, but assume that she doesn't. Assuming she doesn't, then he would make work what she was proposing for him, which I think is a crazy custody schedule for now a three-year-old. I mean, this child is going to grow up without one parent. Why did she have to move to Columbus, Ohio? She's got a bachelor's degree in business. Is she living in the basement of her parents' house? And she looked for a job in St. Louis. I mean, do we seriously think she could not find a job in St. Louis with a business degree, a bachelor's degree? I mean, the judge didn't believe it. Now, let me say this. Let me ask a question. I mean, Judge Byers seemed to be very concerned about a workable visitation schedule. Right. You know, in other words, if she's in Columbus and he's here, how do you work out? But that's an issue in every removal case, isn't it? It is, but, I mean, the problem with this one is it's seven hours each way.  for the kid in the car to have a visit. Well, I understand. If she moved to Chicago, what would happen? He had a job in Chicago. He'd move up there, too. That was not a problem. They both had jobs in Chicago. She could move to Woodstock and he'd get a job back with guaranteed rate in Chicago and be his cake. But there are... This is all outside the record. This is not outside the record. No, no, it's all in the record. He had a job in Chicago. He had a job in Chicago. She had a job in Chicago. But she just said, if he... Justice Fulmer said, so if she moves to Chicago, it's in the record your guy wouldn't move to Chicago. It's in the record that he could get a job in Chicago and I'm sure he would move to Chicago. What about Ohio? That's not in the record. Right. Guaranteed rate had no offices in Ohio. The closest office was in Michigan. That's in the record. And he looked. I mean, she wanted to move down here to live with her parents and he was able to transfer his job from Chicago to work out of the St. Louis office. There were no offices like that in Ohio. And why Columbus, Ohio? I mean, seriously. She was living in her parents' house. Isn't the evidence that's where she was offered a job? I mean, how does that benefit the child? Well, I understand, but there's nothing illegitimate about the fact that she got a job offered there, that she went and took the job, that it was a legitimate job. I mean, there's no dispute about that, is there? You know, I'm sorry, Judge. I have to say, if you look at everything she did, every time he tried to visit, she wouldn't interfere with it. When he asked her to change the pick-up time one hour, he objected. I guess my question is, I mean, if this was all a conspiracy to take the child away from him, why wouldn't she go to California or Alaska or Maine? You know what I mean? She didn't have an excuse to go there. She had an excuse to go to Ohio. I mean, seriously. You mean, getting this job was an excuse? In my opinion, absolutely. And, Judge, bear with me. Had she worked with him? Had she facilitated? Had she not? I mean, we have e-mails, and we'll talk about the e-mails in a second, but we have e-mails where she says, unless you do A, B, C, and D, you're not going to see Jackson. Okay? And by living in Ohio, she was able to do that. If she stays in Ohio, my guy is going to have no relationship with his son growing up, not only because he's in Ohio, but because she has proven she will not work with him. The difference is, Judge Byers believed on the evidence, seeing these people, listening to these people, that Chase had demonstrated, as in his order, had demonstrated his willingness to work with her, and he would work with her. He would make the schedule work. She would find any excuse under the sun to make the schedule. Now, look, that's why his visitation, his alternate visitation schedules were so detailed, because he saw from listening to her, if he left her any loopholes, she would use that as a way to throw a roadblock. But it's my understanding that despite listening to her, he entered an order that's not workable because you have to leave it Friday, for example. Nobody gets off at the exact time on Friday that he's ordered. Is that true or not true? I don't think that's true. I don't think the visitation schedule makes it at all unworkable. So what's happening now? What's the visitation schedule now? It's what it has been. He gets to drive to Terre Haute, pick up his son about noon. He gets Saturday afternoon with his son, Saturday night. They get up Sunday morning. They have time in the morning. Then he gets back in the car and drives back to Terre Haute. And is that every other weekend? No, he gets one full week a month also. And is that Judge Byers' order? That's not Judge Byers'. No, that's your order. That was the order that stayed the judgment. Right. But what's going to happen with that week when he starts kindergarten? And I guarantee you if you read this record, this lady's going to have him in preschool before kindergarten. So as soon as he starts kindergarten, that means there'll be nothing. Do you think preschool is a bad thing? Ma'am? Do you think preschool is a bad thing? Not at all. I think it's a great thing. Do you think that a mother checking to make sure that anybody transporting a baby has a car seat is a bad thing? Not at all. But if you read this record, he was going to take a Jackson to visit his family in Colorado. She insisted that he drive to Columbus, spend the night in a motel, call her to verify he was in the motel, and not call from his cell phone, but call from the motel phone so she could verify he was in the motel, and then give him the name of the doctor that he was going to see in Colorado if he got sick, exactly where he was going to be living, the make and model of the car seat that he was going to be using in Colorado, and if he didn't do that, the email is you're not getting Jackson. And the reason we use emails is because we get into the he said, she said, and I remember she said this, you remember she said that. The emails back and forth, there were no settlement negotiations. These were parents talking back and forth about when do I pick the kid up, and the judge didn't have to believe what my guy said about what Katie said. He read it in her own words, and she was a big emailer, and it was crystal clear exactly what she said. So the emails, if we worry about the quality of the evidence, I think emails are a great thing because they take all the spin and interpretation out. Were all the emails submitted? A number of my emails were not submitted. I don't know where the court gets thousands of emails. I submitted probably 20 or 30, and they were all relevant. Katie never objected that these were not her emails. I'm asking, were all of the emails between the parties submitted to the court? No. So they were cherry picked? Sure. By? I picked the ones that I wanted to submit. She had exhibits of emails. The first exhibit she had admitted was a text message. So she can't complain that I'm doing it because she was doing it. But it's not cherry picking. If you read the record, Judge Byers got aggravated with me about halfway through. Now I was the respondent. I didn't get to start my case until I think 130. But about halfway through, he got a little aggravated. He said, come on, move on, move on, we get the picture. So no, I did not admit that I was  I was not facilitating the relationship of the child with David. And it's not in a general way. It was in any way possible. When he would ask, the GAL suggested, why don't you do a week at a time like we're doing now? He asked for a week. She said, no, I can't do it. He asked for the next week after that. No, I can't do it. This was not in a general way. It was a pattern. It was a relentless pattern of interfering with his opportunity to have a real relationship with his son. And what Judge Byers believed is the Katie that was the real Katie was not the one that showed up at trial and said, well, I might have been a little compulsive. I might have been a little over the top. He believed the real Katie was the Katie   and said, well, I might have            He said I might have been a little over the top. He said, well, maybe I was a little over the top and I might have been over the top  bit lower  Katie.     was a  over the top and I was a little over the top in my opinion. And I believe our opinion was exactly that. I think that's the evidence. But if this court believes my and that was not Chase's testimony. If this court believes that my client asked to move into his in-laws basement and within two weeks she announced she was getting a divorce and he was getting out of there. They were planning on a trip to Colorado. But this woman if you read the record was absolutely relentless. There's no evidence in the record. I didn't put on Mr. Smith who says I own Smith Industries and I'll give you a job starting on Monday. There is common sense however. There's a lot of BAs that are unemployed. You would agree with me on that. I would agree with you but she worked multiple different jobs. She's not like a brain surgeon that has to have one specific type of machine and there's only one here and there's one at Harvard. She has a bachelor's degree in law. But again the issue that Judge Byers was focusing on was which one is the real Katie? He saw her and he heard her and he heard the evidence and he believed the real Katie was the Katie that's going to prevent death from spending time with her son. Thank you. It's interesting that you talk about the job market. For all the time that Mr. Stiger spent chasing through the email there was no evidence which you could easily get as far as what job opportunities there were in St. Louis. There was uncontroverted evidence from Katie not only at the 10th of August but also in the final hearing in front of Judge Byers as to the climate for the job market in advertising in St. Louis, Chicago and that there just wasn't anything out there. She spent three and a half months searching. This woman is not a slacker. Let's not forget that the record will also show you that while she was pregnant and they were living in Chicago, she worked two jobs to make ends meet while Rick's clients sat at home doing nothing. So to say that she didn't do a fastidious job search is really unfair. Nobody falls chase for impulsively quitting a job where he could have worked from home, taking a job to do it the way we teach our kids to do it. Searches, I think she had 30 jobs, 29 of them were either in St. Louis or Madison County, that area. One was in Ohio and that one she's offered. It's her career job and she's allowed to choose her career. Since when do we tell people you can't choose your career? And she can expand her horizons a little bit. But she gets offered a job, it's in Ohio, it's a great job, it's got benefits, she can bonus out, she's going to be getting a promotion at the end of 13. When she wants to go off and do that, because there's nothing else as opposed to the lofty ambition of living in her parents' basement, suddenly that's not good enough and the judge can intersperse his opinion just like Mr. Steiger of I'm sure she could find something in St. Louis. Well, she looked in St. Louis and she couldn't find anything. So to imply or insinuate that she went to Ohio to frustrate his visitation is absurd. The schedule that we're on now is a schedule that was suggested by Katie and myself and this court agreed with. And that's what she's been doing under the emergency stay. It's also the schedule that the GAL recommended. The same GAL who said these parties can be co-parents who also said that Chase was the one who really wanted her to quit her job and move down here. Not that it matters. They were married. They made a joint decision. The same GAL said that Katie has tried to include him. Chase by his own admission indicated he didn't want to take part in the decision of where his child would go to day one.    on the market. They had their house on the market. This was in 11 and 12. They took the house off the market when it became clear that she might not be able to stay there permanently and their house was not selling. To imply that it was some sort of contrived evidence by Katie is ridiculous. Nobody challenged the fact that this house had been on the market. It had. They couldn't sell their house. They're not moving in the middle of litigation. The court found that they could do joint custody. Just because the parents don't get along and don't fight doesn't mean it's not in the best interest of the children. These people don't fight in front of Jackson and they always manage to get it right eventually. The fact that Katie is fastidious and says things in a way that I wouldn't want to  my children. This kid is doing great. And I would ask you to allow my client to please be able to remain in Ohio and not accept their life. Thank you. Thank you. We'll take the matter under advisement. We'll have an opinion forthwith. Thank